**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, | No. 13-15855 |
| *Plaintiff-Appellant*, | D.C. No. 3:12-cv-00711-RS |
| v. | |
| U.S. DEPARTMENT OF TRANSPORTATION; ANTHONY FOXX, in his official capacity as Secretary, Department of Transportation; PIPELINE & HAZARDOUS MATERIALS SAFETY ADMINISTRATION; MARIE THERESE DOMINGUEZ, in her official capacity as Deputy Administrator of Pipeline & Hazardous Materials Safety Administration, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted
May 13, 2015—San Francisco, California

Filed July 30, 2015

Before: Sidney R. Thomas, Chief Judge, John B. Owens, Circuit Judge, and Anthony J. Battaglia,[*] District Judge.

Opinion by Chief Judge Thomas

---

**SUMMARY[**]**

---

### Natural Gas Pipeline Safety Act

The panel affirmed the district court's dismissal of an action brought by the City and County of San Francisco against the Secretary of Transportation and the Pipeline and Hazardous Materials Safety Administration (the "Agency"), alleging claims under the Natural Gas Pipeline Safety Act of 1968 and the Administrative Procedure Act, arising after a natural gas transmission pipeline exploded in San Bruno, California, causing multiple deaths and injuries and widespread damage to property.

The panel held that the plain statutory language, the statutory structure, the legislative history, the structure of similar federal statutes, and interpretations of similar statutory provisions by the Supreme Court and other circuits led to its conclusion that the Pipeline Safety Act did not authorize mandamus-type citizen suits against the Agency.

---

[*] The Honorable Anthony J. Battaglia, District Judge for the U.S. District Court for the Southern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that San Francisco's claims – that the Agency violated the Administrative Procedure Act by (1) unlawfully withholding the action of deciding whether the California Public Utility Commission adequately enforced federal pipeline safety standards, and (2) arbitrarily and capriciously approving the Commission's certification and providing federal funding to the Commission – were not cognizable under the Administrative Procedure Act.

## COUNSEL

Christine Van Aken (argued), Kristine A. Poplawski, Owen J. Clements, and Dennis J. Herrera, City Attorney's Office for the City and County of San Francisco, San Francisco, California, for Plaintiff-Appellant.

Patrick G. Nemeroff (argued), Mark B. Stern, André Birotte, Jr., and Stuart F. Delery, United States Department of Justice, Washington, D.C., for Defendants-Appellees.

Glenn Vanzura and Lee A. Linderman, Irell & Manella LLP, Los Angeles, California, for Amicus Curiae Pipeline Safety Trust.

## OPINION

THOMAS, Chief Judge:

On September 9, 2010, a natural gas transmission pipeline owned and operated by Pacific Gas & Electric Company ("PG&E") ruptured in San Bruno, California. The ensuing explosion and fire killed eight people, injured dozens more,

and caused widespread damage to property. Fearing a recurrence, the City and County of San Francisco ("San Francisco") filed suit against the Secretary of Transportation ("Secretary") and the Pipeline and Hazardous Materials Safety Administration ("the Agency"), alleging that the Agency failed to comply with the Natural Gas Pipeline Safety Act of 1968, 49 U.S.C. § 60101 et seq. ("Pipeline Safety Act").

Under the Pipeline Safety Act, the Agency promulgates minimum federal safety standards for natural gas pipelines and pipeline facilities. The California Public Utility Commission ("CPUC") has assumed jurisdiction to regulate and enforce the Pipeline Safety Act's requirements as to intrastate pipelines within California. San Francisco alleges that the Agency violated the Pipeline Safety Act when it approved the CPUC's certification that its regulatory activities meet the minimum federal standards set by the Agency, and when it disbursed funding to the CPUC to support monitoring and enforcement of intrastate pipelines in California.

The issue in this case is whether San Francisco's claims may proceed, either under the Administrative Procedure Act ("APA") or under the Pipeline Safety Act's citizen suit provision. We conclude that they may not.

I

The soil beneath our feet is crisscrossed with natural gas pipelines. There are 2.5 million miles of natural gas and hazardous liquid pipelines throughout the United States, including 100,000 natural gas pipelines in California. We rely on these pipelines to supply our critical energy needs, but

they also pose public safety risks. Pipelines transport highly flammable, often highly pressurized, natural gas to urban areas through many aging pipelines originally designed for use in lower population density regions.

Although interstate pipelines have been subject to federal regulation since 1938, states retained exclusive jurisdiction over regulation of pipelines wholly within their borders until 1968. In that year, Congress enacted the Pipeline Safety Act, which empowered the Secretary to promulgate minimum federal safety standards for all natural gas pipelines and facilities. Since its creation in 2004, the Agency has administered the Pipeline Safety Act pursuant to delegation by the Secretary.

Intrastate pipeline regulation remains distinct from that of interstate pipelines. Although states may not directly regulate or impose additional or more stringent safety standards on interstate pipelines, 49 U.S.C. § 60104(c), the Pipeline Safety Act provides a strong role for state involvement in intrastate pipeline regulation. If a state certifies that it has adopted the minimum federal safety standards and is enforcing those standards, the state assumes exclusive regulatory jurisdiction over most intrastate pipelines within its borders. *See id.* § 60105(a)–(b). A state that has done so may choose to impose additional or more stringent requirements on intrastate pipelines so long as they continue to meet the minimum federal safety standards established by the Agency. *Id.* § 60104(c).

Unlike similar statutes that require more active federal intervention, such as the Clean Air Act, the cooperative federalism scheme established by the Pipeline Safety Act contains only two short subsections describing the Secretary's

authority to monitor state safety programs and reject a certification.  They are contained at the end of § 60105, which lays out the process for states assuming jurisdiction over intrastate pipelines:

> **(e) Monitoring**.–The Secretary may monitor a safety program established under this section to ensure that the program complies with the certification. A State authority shall cooperate with the Secretary under this subsection.

> **(f) Rejections of certification**.–If after receiving a certification the Secretary decides the State authority is not enforcing satisfactorily compliance with applicable safety standards prescribed under this chapter, the Secretary may reject the certification, assert United States Government jurisdiction, or take other appropriate action to achieve adequate enforcement.  The Secretary shall give the authority notice and an opportunity for a hearing before taking final action under this subsection.  When notice is given, the burden of proof is on the authority to demonstrate that it is enforcing satisfactorily compliance with the prescribed standards.

*Id.* § 60105(e)–(f).

The Pipeline Safety Act also provides for federal funding to states that assume jurisdiction under § 60105 up to 80% of the costs reasonably required to carry out the safety program. *Id.* § 60107(a).  The Secretary's authority to provide funding

is restricted to cases where the state ensures the Secretary that it will provide the remaining costs of a safety program. *Id.* § 60107(b).

In addition, the Agency may withhold any part of a payment when it decides that the authority is not carrying out satisfactorily a safety program. *Id.* The Agency determines the percentage (up to the allowable ceiling of 80%) of funding it will provide to states by combining two equally weighted metrics: (1) a score assigned to that state's annual progress report which must be submitted after certification; and (2) a score resulting from an annual program evaluation undertaken by the Agency. 49 C.F.R. § 198.13(b). These scores reflect an assessment of the state's policies and procedures, its inspection practices and capacity, overall enforcement activity, and other indicia of program performance. *Id.* § 198.13(c).

California has participated in this cooperative federalism scheme for decades. The CPUC has assumed responsibility for regulating and enforcing a pipeline safety program for intrastate pipelines and pipeline facilities pursuant to certification under the Pipeline Safety Act. *See* Cal. Pub. Util. Code § 955(b). In 2011, the CPUC received 71% funding from the Agency as a result of the aggregate scoring system.

II

This litigation arose in response to the disastrous 2010 natural gas pipeline failure and resulting explosion in San Bruno, a fatal explosion in 2008 in Rancho Cordova, and a 2011 accident in Cupertino that caused significant property damage. PG&E owned and operated all three pipelines

involved in the incidents.  The National Transportation and Safety Board ("NTSB") determined the probable cause of the San Bruno explosion to be "inadequate quality assurance and quality control in 1956" (when the pipeline was relocated) and an "inadequate pipeline integrity management program." Nat'l Transp. Safety Bd., NTSB/PAR-11/01, Pacific Gas and Electric Company Natural Gas Transmission Popeline Rupture and Fire, San Bruno, California, Sept. 9, 2010, at xii (2011), *available at* http://ntsb.gov/investigations/Accident Reports/Pages/PAR1101.aspx.  The NTSB report also cited regulatory provisions exempting the ruptured pipeline from pressure testing requirements, the CPUC's failure to detect PG&E's inadequate safety program, and PG&E's "flawed emergency response procedures and delay" as contributory factors. *Id.*  NTSB's chairman, joined by two other members, wrote a concurrence observing that PG&E exploited weaknesses in a lax system of oversight and that "regulators . . . placed a blind trust in the companies that they were charged with overseeing—to the detriment of public safety." *Id.* at 135.

Citing the "substantial and unnecessary risk" posed to its citizens' lives and property by allegedly inadequate monitoring and regulation, San Francisco sued the Agency and the United States Department of Transportation. Invoking the Pipeline Safety Act's citizen suit provision, San Francisco sought declaratory and injunctive relief to compel the Agency to comply with its duties under the Pipeline Safety Act.

After holding that San Francisco met constitutional standing requirements to bring a claim, the district court dismissed the suit with leave to amend because the claim was not cognizable under the Pipeline Safety Act's citizen suit

provision. The court explained that "while § 60121 would authorize a suit against government entities to the extent they engage in activities regulated by the [Pipeline Safety Act]—such as constructing or operating pipelines—it is not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations."

San Francisco amended its complaint to include claims under the APA, arguing that the Agency's approval of the CPUC's certification was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) and also constituted a failure to act under 5 U.S.C. § 706(1). The district court dismissed the Amended Complaint for failing to state a claim and lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(1). The court reasoned that San Francisco's failure to act claim was in essence a challenge to the sufficiency of the Agency's action, not a genuine inaction claim. The court then characterized San Francisco's § 706(2)(A) claim as "coextensive" and dismissed it as well.

We have jurisdiction over the district court's entry of final judgment pursuant to 28 U.S.C. § 1291, and we review the district court's dismissal de novo. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 911 (9th Cir. 2012) (en banc); *Ctr. for Policy Analysis on Trade & Health v. Office of the U.S. Trade Representative*, 540 F.3d 940, 944 (9th Cir. 2008).

III

The district court properly concluded that the Pipeline Safety Act's citizen suit provision does not allow mandamus-type actions against the Agency in its capacity as regulator.

When examining the scope of a private right of action under a federal statute, we employ the usual tools of statutory construction, looking first at the plain words of the statute, "particularly to the provisions made therein for enforcement and relief." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981). "[W]hen deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, __ U.S. __, 135 S. Ct. 2480 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). In addition, we examine the legislative history, the statutory structure, and "other traditional aids of statutory interpretation" in order to ascertain congressional intent. *Middlesex Cnty.*, 453 U.S. at 13. As part of statutory analysis, "[w]e also look to similar provisions within the statute as a whole and the language of related or similar statutes to aid in interpretation." *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).

The Pipeline Safety Act, by its plain language, allows only a very limited private right of action. It permits injunctive citizen suits against the United States or other entities "for a violation of this chapter or a regulation prescribed or order issued under this chapter." 49 U.S.C. § 60121(a). In other words, private citizen suits are authorized for substantive statutory or regulatory violations. By its terms, the provision does not authorize a mandamus-type action to compel the Agency to perform non-discretionary regulatory duties.

The statutory structure supports the conclusion. Indeed, mandamus actions are authorized as part of the Pipeline Safety Act's whistleblower protection provisions. 49 U.S.C. § 60129(c). The inclusion of such a remedy in another

portion of the statute indicates that Congress was aware of the remedy and how to create it.  The fact that Congress chose not to include a mandamus-type remedy in its citizen suit provision is significant.    "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration in original).

The Pipeline Safety Act's legislative history buttresses the conclusion that Congress did not intend to create a citizen suit mandamus remedy, emphasizing  that the citizen suit provision "would not supplant the Secretary's efforts for enforcement and compliance," but was "designed to assist the Department in its enforcement and compliance activities."  S. Rep. No. 94-852, at 8 (1976).  San Francisco points to a floor statement by a single legislator tangentially suggesting the possibility of mandamus-type actions to enforce federal regulations. *See* 122 Cong. Rec. 32,725 (1976) (statement of Rep. Brown).  However, as the Agency points out, there were no similar statements from other lawmakers or any further discussion of the possibility of mandamus-type actions, which suggests that the cited statement was merely "a single outlying statement" that must not be dispositive.  *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 599 (2004); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history.").

Examination of the statutory language of similar statutes also bolsters the conclusion that the Pipeline Safety Act does not authorize mandamus actions against the Agency.  Of significance here is the statutory language of citizen suit

provisions in similar statutes enacted during the same time period as the Pipeline Safety Act. Those statutes tend to include two separate citizen suit provisions: one that provides for suits alleging a violation of a statute's substantive provisions, and one that authorizes suits against the agency head for failing to perform a nondiscretionary duty. *See, e.g.*, 16 U.S.C. § 1540(g)(1)(B)–(C) (Endangered Species Act); 42 U.S.C. § 7604(a)(1)–(2) (Clean Air Act). The latter type of provision, which specifically provides for mandamus relief, is conspicuously absent from the Pipeline Safety Act.

The Supreme Court has interpreted a very similar citizen suit provision in the Endangered Species Act ("ESA") as not authorizing suits against an agency alleging improper implementation of a statute. In *Bennett v. Spear*, 520 U.S. 154, 173 (1997), the Court held that "the term 'violation' does not include the Secretary's failure to perform his duties as administrator of the ESA." The district court in this case relied heavily on *Bennett* in holding that the Pipeline Safety Act's citizen suit provision, like the similarly-worded provision at stake in *Bennett*, only provides for suits against the government in its capacity as a regulated party.

San Francisco attempts to distinguish *Bennett* by pointing out that, unlike under the ESA, the federal government is not subject to the Pipeline Safety Act's substantive requirements. *See* 49 U.S.C. §§ 60101(a)(17), 60108, 60117, 60118(a)(1). Furthermore, it argues, *Bennett* reflects the Court's need to harmonize two side-by-side citizen suit provisions. *See* 520 U.S. at 173 (explaining that allowing suits under 16 U.S.C. § 1540(g)(1)(A) for any violation of the ESA would render § 1540(g)(1)(C) a nullity).

However, *Bennett* itself approached the question by looking to the statute as a whole.  520 U.S. at 174.  Doing so here, the arguments in support of the district court's application of *Bennett* to the Pipeline Safety Act outweigh those against it.  All three reasons cited by the *Bennett* Court support the district court's conclusion.[1]

First, San Francisco's argument that the provision authorizing mandamus relief in the Pipeline Safety Act's whistleblower protection section, 49 U.S.C. § 60129(c), need not be harmonized with the citizen suit provision, *id.* § 60121(a), is not persuasive.  While the proximity of the two citizen suit provisions in the ESA may have reinforced the need to read them in complementary fashion, the mere fact that the mandamus provision in the Pipeline Safety Act is eight sections removed from the general citizen suit provision does not mean that they need not be read together as part of a comprehensive statutory scheme.  The inclusion of § 60129(c) indicates that Congress was well aware of its ability to specifically authorize mandamus suits against the Secretary.

Second, the use of "violation" in § 60121(a) also supports the district court's conclusion.  Elsewhere in the Pipeline Safety Act, "violation" consistently and exclusively refers to substantive violations by regulated parties.  Like the ESA, the Pipeline Safety Act provides for substantial civil and criminal

---

[1] The Court in *Bennett* explained that (1) the two citizen suit provisions must be read compatibly with each other; (2) the use of the term "violation" elsewhere in the statute indicates it was meant to cover only the behavior of regulated parties; and (3) a broad reading of "violation" to include any maladministration of the statute would abrogate the APA's final agency action requirement.  520 U.S. at 172–74.

penalties for such violations.  *See, e.g.*, 49 U.S.C. § 60122(a) (providing for civil penalties up to $200,000 per violation of the Pipeline Safety Act); *id.* § 60123(a) (providing for criminal liability for knowing and willful violations of the Pipeline Safety Act); 16 U.S.C. § 1540(a) (authorizing substantial civil penalties for violations of the ESA); *id.* § 1540(b) (creating criminal liability for violations of the ESA); *id.* § 1540(e)(3) (authorizing warrantless arrests for violations of the ESA).  As in the context of the ESA, a "violation" of the Pipeline Safety Act is "most unlikely to refer to failure by the Secretary or other federal officers and employees to perform their duties in administering the [Pipeline Safety Act]."  *See Bennett*, 520 U.S. at 173.  San Francisco argues that while the ESA penalty provisions apply to "any violation," the Pipeline Safety Act's penalty provisions specify violations that could only be committed by a regulated party, and thus there is no risk of the implausible result of the Secretary being arrested for failure to perform her statutory duties.  However, there is no reason to believe that Congress used "violation" to mean a much broader set of actions in § 60121(a) than it did in those other provisions.

Third, San Francisco's permissive reading of § 60121(a) would abrogate the APA's "final agency action" requirement to the same degree that the plaintiffs' interpretation of the ESA would have in *Bennett*.  *See* 520 U.S. at 174.  "Any procedural default, even one that had not yet resulted in a final disposition of the matter at issue, would form the basis for a lawsuit."  *Id.*  As with the ESA, there is no clear statutory directive militating such an "extraordinary regime." *See id.*

Our sister circuits' cases support this construction. Following *Bennett*, the Fifth and Tenth Circuits interpreted a

citizen suit provision similar to the one at issue here to not allow review of agency implementation of the Outer Continental Shelf Lands Act. *Amerada Hess Corp. v. Dep't of Interior*, 170 F.3d 1032, 1034–35 (10th Cir. 1999) (agreeing with the Fifth Circuit that the citizen suit provision does not authorize suits because they are available under the APA and because such an interpretation would abrogate the APA); *OXY USA, Inc. v. Babbitt*, 122 F.3d 251, 258–59 (5th Cir. 1997) (holding that the citizen suit provision did not apply because it would provide "a means of obtaining 'umbrella' review for a series of agency decisions that were or will be otherwise subject to judicial review under the APA" and because "neither the text nor legislative history of [the Act] manifests congressional intent to repeal the APA"). A recent Sixth Circuit decision declined to allow a suit under the citizen suit provision of the Clean Air Act when only one of the three reasons cited by *Bennett* was present in force. *See Sierra Club v. Korleski*, 681 F.3d 342, 348–50 (6th Cir. 2012) (disallowing a citizen suit against a state for failure to comply with the CAA on the grounds that (1) the term "violation" used elsewhere in the CAA indicates that it was not meant to include such action; and (2) such a broad interpretation of "violation" would be inconsistent with the sanctions regime of the CAA).

In sum, the plain statutory language, the statutory structure, the legislative history, the structure of similar federal statutes, and interpretations of similar statutory provisions by the Supreme Court and our sister circuits lead to the conclusion that the Pipeline Safety Act does not authorize mandamus-type citizen suits against the Agency.

IV

The district court also properly concluded that San Francisco's claims were not cognizable under the APA. San Francisco's amended complaint alleged that the Agency violated the APA by (1) unlawfully withholding the action of deciding whether the CPUC adequately enforces federal pipeline safety standards, and (2) arbitrarily and capriciously approving the CPUC's certification and providing federal funding to the CPUC.

A

Judicial review of agency action is not available for decisions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has explained that a decision is committed to agency discretion by law when "a court would have no meaningful standard against which to judge the agency's exercise of discretion," such as "where statutes are drawn in such broad terms that in a given case there is no law to apply." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (internal quotation marks omitted).

While this "narrow exception" only occurs in "rare instances," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *Heckler* carved out a presumption of unreviewability of an agency's decision not to take enforcement action. 470 U.S. at 831. The Court set forth several reasons why agency enforcement decisions are generally not suitable for judicial review: (1) "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," such as allocation of resources and agency policies and priorities; (2) an agency is better equipped to

make that balancing than a court; (3) an agency's refusal to enforce does not implicate personal liberty or property rights, which courts are often called on to protect; and (4) an agency's decision not to enforce is analogous to prosecutorial discretion, an arena in which courts have traditionally not interfered. *Id.* at 831–32. *Heckler* went on to clarify that the presumption of unreviewability is rebuttable "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33.

Actions committed to agency discretion under 5 U.S.C. § 701(a)(2) are not limited to decisions not to enforce. The Supreme Court has held that the allocation of funds from a lump-sum appropriation is another decision that is committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).   The Court explained that Congress' appropriation of a lump sum without statutory restriction creates the inference that Congress does not intend to impose legally binding restrictions on agency decisionmaking, and courts may not review the allocation of those funds under § 701(a)(2) so long as the agency allocates them to meet permissible statutory objectives. *Id.* at 192–93.

1

Applying the principles of *Heckler*, the district court properly determined that the Agency's decision not to reject the CPUC's certification was unreviewable under § 701(a)(2) of the APA. The Agency's approval of the CPUC's annual certification is a decision not to enforce, a decision that is presumptively unreviewable under § 701(a)(2) of the APA. The structure of the Pipeline Safety Act supports this conclusion.

First, § 60105(a) provides that a state assumes jurisdiction over its intrastate pipelines *automatically* upon submitting a certification. The Agency may decide to subsequently reject the certification, but before doing so it must provide the state authority with notice and an opportunity for a hearing. 49 U.S.C. § 60105(f). The Agency "accepts" certifications by merely declining to act. By providing that "the Secretary *may* reject [a] certification," *id.* (emphasis added), the statute makes clear that the decision to reject a certification is discretionary and therefore will involve balancing a number of considerations, including availability and allocation of agency resources, the predicted outcome of any hearing, and agency policies and priorities. The Agency receives certifications from over fifty state authorities, and must choose where to expend its resources in challenging a certification and, if it ultimately rejects one, assuming responsibility for enforcement in that state. In short, the Agency requires regulatory flexibility in deciding how to allocate enforcement resources.

Second, the federalism structure of the Pipeline Safety Act favors state assumption of jurisdiction. Management of this delicate federal-state relationship was delegated by Congress to the Secretary, and courts are not institutionally well-equipped to micromanage it.

Third, the text of the statute provides no indication that Congress intended to restrict agency discretion. While the use of the word "shall" elsewhere in the Pipeline Safety Act clearly indicates that Congress had no trouble imposing duties on the Secretary, the relevant sections to certification are peppered with the classic language of discretion. The Agency "*may* reject [a certification]" "[*i*]*f* the Secretary decides the State authority is not enforcing satisfactorily compliance with

applicable safety standards." 49 U.S.C. § 60105(f) (emphases added). Without receiving any certification the Secretary "*may*" also "make an agreement with a State authority" to assist in enforcing pipeline safety standards. *Id.* § 60106(a) (emphasis added). The Secretary is not even directly required to monitor a state safety program, but she "*may*" (and the State authority "*shall*" comply if she does so). *Id.* § 60105(e) (emphases added). In contrast to the intrastate pipeline context at stake here, the Pipeline Safety Act makes termination of state oversight of interstate pipelines mandatory in certain circumstances: "The Secretary *shall* end an agreement for the oversight of interstate pipeline transportation if the Secretary finds that . . . continued participation by the State authority in the oversight of interstate pipeline transportation would not promote pipeline safety." *Id.* § 60106(e)(2) (emphasis added). And while "the mere fact that a statute contains discretionary language does not make agency action unreviewable," *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994), it certainly places additional weight on that side of the scale. *See id.* (explaining that the analysis required by 5 U.S.C. § 701(a)(2) is statute-specific and discretionary language has been one of several reasons provided for concluding that a statutory provision makes an agency action unreviewable).

For these reasons, we agree with the district court that the Agency's decision not to pursue rejection of the CPUC's certification is therefore unreviewable under § 701(a)(2) of the APA.

2

The district court also properly concluded that the Agency's annual grant of funds to the CPUC is a decision

presumptively committed to agency discretion, and therefore non-reviewable.

"[T]he very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. For the Agency, that may mean creating incentives for states to improve their regulatory efforts in targeted ways, calibrating funding to states to best balance competing priorities, or devoting particular resources to state authorities that need the most assistance or are pioneering innovative practices. The Agency is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831–32).

"[C]ourts may not use the APA to review an agency's decision to allocate funds absent some statutory constraint on the agency's discretion." *Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell*, 729 F.3d 1025, 1038 (9th Cir. 2013). The Pipeline Safety Act provides some guidance to the Secretary in § 60107(a)–(b). Congress demonstrated that it knew how to place definitive restrictions on funding of state authorities by stating that the Agency may provide funds "*only* when the authority ensures . . . that it will provide the remaining costs" and by limiting the amount of funds to 80% of the amount reasonably required by the state program. 49 U.S.C. § 60107(a)–(b) (emphasis added).

The phrase "reasonably requires" in § 60107(a) indicates that Congress intended to vest the Agency with interpretative discretion. *See Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000 (9th Cir. 1998). In *Helgeson*, we held that a

decision to reject an Indian Revolving Fund loan application was unreviewable under 5 U.S.C. § 701(a)(2) because the statute authorizing the Bureau of Indian Affairs to issue revolving loans conditioned the availability of loans on the existence of "a reasonable prospect of repayment," *id.* at 1003–04 (quoting 25 U.S.C. § 1463). We concluded that Congress committed the assessment of whether that prospect existed to the judgment of the agency. *Id.* In arriving at that determination, we also considered the language and structure of the authorizing statute and the nature of the subject matter. As in that case, where Congress used highly discretionary language and the decision involved allocation of financial resources, the Pipeline Safety Act commits the decision of what is "reasonably required" to carry out a safety program to the expertise of the agency.

Finally, it is significant that San Francisco does not argue that the Agency violated the statutory guidelines. It simply does not agree with the choices the Agency made. San Francisco may well have a good policy argument, but such decisions are committed to agency discretion.

B

The district court correctly rejected San Francisco's claim pursuant to 5 U.S.C. § 706(1) that the Agency unlawfully withheld making a decision as to the adequacy of the CPUC's regulation of intrastate gas pipelines before accepting its certification. The Agency characterizes this claim as a programmatic challenge to its implementation of the statute. We agree with the district court that even if the Agency has some mandatory duty to oversee state enforcement efforts, San Francisco's § 706(1) claim is merely a "complaint[] about the sufficiency of an agency action 'dressed up as an

agency's failure to act.'"  *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999).  The failure to act claim is a repackaged version of San Francisco's challenge to the Agency's decision not to pursue rejection of the CPUC's certification, a close analog to a decision not to enforce.  As we have explained, decisions not to enforce are presumptively unreviewable under 5 U.S.C. § 701(a)(2).

V

San Francisco has presented very troubling allegations about the Agency's approach to monitoring the CPUC's regulation of intrastate pipelines.  However, "[w]e have no authority to compel agency action merely because the agency is not doing something we may think it should do."  *Zixiang Li v. Kerry*, 710 F.3d 995, 1004 (9th Cir. 2013).  Neither the Pipeline Safety Act nor the APA authorize San Francisco's claims.  Therefore, the district court properly dismissed the action.  We need not, and do not, reach any other argument raised by the parties.

**AFFIRMED.**