**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| TIN CUP, LLC, an Alaska limited liability company, *Plaintiff-Appellant*, | No. 17-35889 |
| v. | D.C. No. 4:16-cv-00016-TMB |
| UNITED STATES ARMY CORPS OF ENGINEERS, *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, Chief Judge, Presiding

Argued and Submitted June 13, 2018
Anchorage, Alaska

Filed September 21, 2018

Before: Sidney R. Thomas, Chief Judge, and Consuelo M.
Callahan and Carlos T. Bea, Circuit Judges.

Opinion by Chief Judge Thomas;
Concurrence by Judge Bea

**SUMMARY**[*]

**Environmental Law**

The panel affirmed the district court's summary judgment in favor of the U.S. Army Corps of Engineers in a lawsuit that sought to set aside the Corps' decision for an excavation permit; and held that language in a 1993 appropriations act did not require the Corps to continue to use a 1987 guidance manual for delineating wetlands under the Clean Water Act.

The Clean Water Act prohibits "the discharge of any pollutant" without an appropriate permit; this prohibition applies to "the waters of the United States;" and the term "pollutant" includes dredged and fill material. 33 U.S.C. §§ 1311(a), 1362(7), and 1362(6), (12). In 1987, the Corps issued a guidance document concerning the wetland delineation process. The 1993 Budget Act directed that the Corps continue to use the 1987 Manual.

The Corps issued plaintiff a permit that would allow it to discharge gravel fill into 118 acres of wetlands, but included mitigation conditions that plaintiff found onerous. Plaintiff argued that the 1992 and 1993 Budget Acts required the Corps to continue to use the 1987 Manual and its definition of a growing season, without considering a 2007 Alaska Supplement.

The panel held that it would only conclude that an appropriations act made permanent changes in substantive

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

law if Congress was clear about its intentions. The panel further held that, absent a clear statement of futurity, a provision in an appropriations act is only in force for the fiscal year of the appropriation. The panel concluded that plaintiff had not shown a clear statement from Congress that the 1993 Budget Act enacted a mandatory, permanent change in substantive law.

Judge Bea concurred in the majority's ultimate conclusion that the district court did not err in granting summary judgment to the Corps, but he wrote separately because he would hold that the 1993 Budget Act contained sufficient words of futurity to bind the Corps after the 1993 fiscal year.

## COUNSEL

Jeffrey W. McCoy (argued), Damien M. Schiff, and James S. Burling, Pacific Legal Foundation, Sacramento, California, for Plaintiff-Appellant.

John D. Gunter II (argued), Michael T. Gray, and Amanda S. Berman, Trial Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

# OPINION

THOMAS, Chief Judge:

In this case, we consider what should be considered the growing season in Alaska's permafrost and, specifically, whether language in a 1993 appropriations act requires the U.S. Army Corps of Engineers (the "Corps") to continue to use a 1987 guidance manual for delineating wetlands under the Clean Water Act. We conclude that it does not, and we affirm the district court.

I

A

The Clean Water Act (the "Act") prohibits "the discharge of any pollutant" without an appropriate permit. 33 U.S.C. § 1311(a). This prohibition applies to "the waters of the United States," 33 U.S.C. § 1362(7), and the term "pollutant" includes dredged and fill material, such as gravel or sand, 33 U.S.C. §§ 1362(6), (12). In the period relevant to this case, regulations defined "waters of the United States" to include wetlands that are adjacent to other covered waters. 33 C.F.R. § 328.3(a)(7). The Act allows the Corps to issue permits for discharging dredged or fill material into waters of the United States. 33 U.S.C. § 1344(a).

In 1987, the Corps issued a guidance document "to provide users with guidelines and methods to determine whether an area is a wetland for purposes of" the Act. U.S. Army Corps of Eng'rs, *Corps of Engineers Wetlands Delineation Manual* (Jan. 1987) (the "1987 Manual") at 1. The 1987 Manual directs that the wetland delineation process

be guided by three criteria: hydrophytic vegetation, hydric soils, and wetland hydrology. Under the 1987 Manual, satisfaction of the wetland hydrology criterion generally requires the presence of a "growing season," defined as a season in which soil temperature at 19.7 inches below the surface is above 5°C. In 1989, the Corps joined other federal agencies in adopting a new manual to supersede the 1987 Manual. Fed. Interagency Comm. for Wetland Delineation, *Federal Manual for Identifying and Delineating Jurisdictional Wetlands* (Jan. 1989) (the "1989 Manual"). The 1989 Manual employed less stringent methods for delineating methods wetlands than the 1987 Manual.

In response to complaints from business groups and legislators, Congress limited the use of the 1989 Manual in the Energy and Water Development Appropriations Act of 1992, Pub. L. No. 102-104, 105 Stat. 510 (Aug. 17, 1991) (the "1992 Budget Act"). The 1992 Budget Act prohibited the use of funds to delineate wetlands under the 1989 Manual "or any subsequent manual not adopted in accordance with the requirements for notice and public comment of the rule-making process of the Administrative Procedure Act." 105 Stat. at 518. The 1992 Budget Act also required the Corps to use the 1987 Manual to delineate any wetlands in ongoing enforcement actions or permit application reviews. *Id.*

The following year, Congress enacted the Energy and Water Development Appropriations Act of 1993, Pub. L. 102-377, 106 Stat. 1315 (Oct. 2, 1992) (the "1993 Budget Act"). The 1993 Budget Act stated in pertinent part:

> None of the funds in this Act shall be used to identify or delineate any land as a "water of

the United States" under the Federal Manual for Identifying and Delineating Jurisdictional Wetlands that was adopted in January 1989 or any subsequent manual adopted without notice and public comment.

Furthermore, the Corps of Engineers will continue to use the Corps of Engineers 1987 Manual, as it has since August 17, 1991, until a final wetlands delineation manual is adopted.

106 Stat. at 1324.[1]

At the same time that Congress mandated continued use of the 1987 Manual, Congress appropriated money to the U.S. Environmental Protection Agency ("EPA") to contract with the National Academy of Sciences to analyze federal wetlands regulation. *See* Department of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations Act of 1993, Pub. L. 102-389, 106 Stat. 1571 (Oct. 6, 1992); H.R. Rep. No. 102-710, at 51 (1992); H.R. Conf. Rep. No. 102-902 at 41. The ensuing report, published in 1995, recommended a number of changes to the Corps' wetlands delineation process. *See* Nat'l Research Council., Comm. on Characterization of Wetlands, *Wetlands: Characteristics & Boundaries* (1995) at 3. One suggestion was that the 1987 Manual's approach to "growing season" should either be abandoned altogether or replaced by region-specific criteria for wetland delineation. *Id.* at 102. In response, the Corps issued a series of regional "supplements"

---

[1] Following the parties' form, we refer to these two paragraphs as the "first paragraph" and the "second paragraph," respectively.

to the 1987 Manual. These supplements provide region-specific criteria for wetland delineation. To date, the Corps has issued ten such supplements covering the entire United States.

The Corps published its regional supplement for Alaska in 2007. U.S. Army Corps of Eng'rs, *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Alaska Region (Version 2.0)* (Sept. 2007) (the "Alaska Supplement"). Most relevant to this lawsuit, the Alaska Supplement used a different indicator for determining the presence of a growing season than used in the 1987 Manual. Rather than focusing on soil temperature, the Alaska Supplement's definition focuses on "vegetation green-up, growth, and maintenance as an indicator of biological activity occurring both above and below ground." Alaska Supplement at 48.

B

Tin Cup, LLC ("Tin Cup") owns a 455-acre parcel in North Pole, Alaska, which it holds for its parent company, Flowline Alaska. Flowline Alaska seeks to use the parcel for the temporary storage of pipe and other manufactured material. The project will require the excavation and laying down of gravel material, which is a regulated "pollutant" under the Clean Water Act. *See* 33 U.S.C. § 1362(6).

In 2004, Tin Cup obtained a permit from the Corps for the relocation project. Tin Cup proceeded to clear approximately 130 acres from the site, but by 2008, the company had not commenced gravel extraction or fill placement. Thus, in 2008, Tin Cup submitted a new permit application. The Corps examined the extent of wetlands on the site and issued

a new jurisdictional determination in November 2010, concluding that wetlands were present on 351 acres of Tin Cup's 455-acre site, including about 200 acres of permafrost.

In December 2010, Tin Cup administratively appealed the Corps' jurisdictional determination. Tin Cup argued that the site's permafrost cannot qualify as wetlands under the 1987 Manual. Tin Cup argued that, under the 1987 Manual, an area can only be considered a wetland if it has a growing season, and that the 1987 Manual defines a growing season as the season in which soil temperature at 19.7 inches belowground level is at or above 5°C. Tin Cup claimed that the "discontinuous permafrost" on its property did not reach that temperature, and thus that there was no growing season.

In August 2011, the Corps review officer rejected Tin Cup's permafrost argument. The officer ruled in his appeal decision that the Alaska Supplement "recognizes the existence of permafrost and the need to rely instead upon locally or regionally developed methods to determine growing season dates . . . as well as by direct observation of vegetation." Under the Alaska Supplement, the officer noted, "soil temperature at 19.7 inches below the surface is essentially irrelevant to determining the growing season in Alaska."

In October 2012, the Corps issued Tin Cup an initial proffered permit. The permit would allow Tin Cup to discharge gravel fill into 118 acres of wetlands (out of the 165 acres that Tin Cup had applied to fill). However, the permit included mitigation conditions that Tin Cup found onerous. Tin Cup lodged further administrative appeals, which were unsuccessful. The Corps proffered in November

2013 a final permit to Tin Cup, subject to the same mitigation conditions, and it affirmed that permit in March 2015.

In May 2016, Tin Cup initiated the present lawsuit, seeking to set aside the Corps' permitting decision. On its motion for summary judgment, Tin Cup argued that the 1992 and 1993 Budget Acts continue to require that the Corps use the 1987 Manual and its definition of a growing season, without considering the Alaska Supplement. The district court granted summary judgment to the Corps, holding that most of the language in the 1992 and 1993 Budget Acts was limited to the use of funds appropriated in those statutes. Tin Cup appeals that order.

## II

We review the district court's grant of summary judgment de novo. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005). We agree with the district court that the 1993 Budget Act does not require the Corps to continue to use the 1987 Manual's guidelines to delineate wetlands, and we affirm.

## A

While appropriations acts are "Acts of Congress" that can change substantive law, we interpret them somewhat differently than other statutes. An appropriation of funds is generally not permanent or available continuously without an express provision. 31 U.S.C. § 1301(c). The same rule applies to provisions of appropriations acts altering substantive law. Such provisions "are generally only 'in force during the fiscal year of the appropriation and do not work a permanent change in the substantive law.'" *Nat. Res.*

*Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 806 n.19 (9th Cir. 2005) (quoting *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 304 (9th Cir. 1991)). This principle dates to the Supreme Court's opinion in *Minis v. United States*, 40 U.S. (15 Pet.) 423 (1841), in which Justice Story stated:

> It would be somewhat unusual, to find engrafted upon an act making special and temporary appropriations, any provision which was to have a general and permanent application to all future appropriations. Nor ought such an intention on the part of the legislature to be presumed, unless it is expressed in the most clear and positive terms, and where the language admits of no other reasonable interpretation.

*Id.* at 445. There is thus "a very strong presumption" that if an appropriations act changes substantive law, it does so only for the fiscal year for which the bill was passed. *Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 273 (D.C. Cir. 1992).

To rebut this presumption, a party must point to "a clear statement of 'futurity,' such as 'hereafter.'" *Nat. Res. Def. Council*, 421 F.3d at 806 n.19; *see also United States v. Vulte*, 233 U.S. 509, 514 (1914) (holding that appropriations acts did not permanently change substantive law because they did not contain "words of prospective intention"). We will only conclude that an appropriations act has made a permanent change to substantive law if Congress is clear about its intentions. Absent a clear statement of futurity, a provision in an appropriations act is only in force for the fiscal year of the appropriation.

B

The provision at issue in the 1993 Budget Act does not contain a clear statement of futurity. It is significant that the provision does not contain the word "hereafter." "Hereafter" is the most common word of futurity. Government Accountability Office, *Principles of Federal Appropriations Law* (4th ed. 2016 rev.) at 2-86. Congress used "hereafter" throughout the 1993 Budget Act to identify the continuing availability of certain appropriations, *see* 106 Stat. at 1325, 1330–32, 1338, 1339, 1342–43, and continuing prohibitions on certain types of spending, *see* 106 Stat. at 1331, 1343. When Congress uses particular language in one part of a statute and omits it elsewhere, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 999 (9th Cir. 2015) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Even if the provision's second paragraph constituted a command that the Corps use the 1987 Manual, the absence of "hereafter" suggests that Congress did not intend the provision to bind the Corps indefinitely.

Tin Cup argues that the words "will" and "until" in the provision's second paragraph are words of futurity. No authority exists holding that those words in an appropriations bill, absent more, indicate futurity. Nonetheless, Tin Cup argues that if "will" and "until" were *not* construed as words of futurity, then the second paragraph would be superfluous. If Congress only meant to mandate the use of the 1987 Manual in fiscal year 1993, Tin Cup argues, then its aim was accomplished by the first paragraph alone. That paragraph prohibited any funds from being used in fiscal year 1993 to

delineate wetlands in accordance with the 1989 Manual, and the 1987 Manual was the only available alternative.

These two paragraphs reasonably can be interpreted as complementary statements. The first paragraph is a command about what the Corps could not do during fiscal year 1993, and the second paragraph is a description of what Congress expected it to do instead. Indeed, the first paragraph uses the mandatory term "shall," while the second paragraph uses the word "will." The Supreme Court has distinguished descriptive "will" statements from mandatory "shall" statements. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004) (concluding that a statute's requirement that an agency "shall" act in accordance with a land use plan was a mandatory statement, but that a statement in the land use plan about what the agency "will" do was not "a binding commitment"). The 1993 Budget Act's statement that the Corps "will continue to use" the 1987 Manual, 106 Stat. at 1324, should be viewed in these terms. The provision recorded Congress's understanding of the Corps' intention to delineate wetlands using the 1987 Manual. It does not bind the Corps to using the 1987 Manual. Had Congress intended to bind the Corps, it would have used the word "shall." This interpretation comports with the "well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (collecting cases).

This distinction between "shall" and "will" statements is consistent with other provisions of the 1993 Budget Act. Congress seemed to use "will" statements to describe the consequences of mandatory commands. In one provision,

Congress "directed" the Corps to continue an ongoing feasibility study and then stated that the study "will consider the agricultural benefits of using both traditional and nontraditional methods . . ." 106 Stat. at 1316. In another provision, Congress stated that funds "shall be available" for infrastructure studies and then stated that those funds "will be administered by" the Department of Energy. 106 Stat. at 1334. The Corps' interpretation of the provision at issue—that "shall" connotes a mandatory obligation and "will" connotes a description of what Congress expected to happen—is a reasonable reading of the statute. It cannot be said that the language of the statute "admits of no other reasonable interpretation" than the interpretation that Tin Cup has proffered. *Minis*, 40 U.S. at 445.

Tin Cup urges us to conclude that the structure of the paragraphs in the 1993 Budget Act implies that the second paragraph contains a clear statement of futurity. Tin Cup observes that the 1987 Manual provision appears as a separate paragraph from the preceding provision on appropriations for fiscal year 1993, and it argues that this suggests that the two provisions are independent. Thus, Tin Cup argues, the first paragraph applies to fiscal year 1993 and the second paragraph enacts an unrelated permanent change in the law.

More relevant for discerning futurity is the relationship between the *contents* of the two paragraphs. *See* GAO, *Principles of Federal Appropriations Law* at 2-90 (stating that when a "provision bears no direct relationship to the appropriation act in which it appears, this is an indication of permanence . . . The closer the relationship, the less likely it is the provision will be viewed as permanent"). The two paragraphs here bear a close relationship: they both concern

the manual to be used in making wetlands delineation. This weighs strongly in favor of viewing the second paragraph as a descriptive clarification of the first, rather than as an independent provision establishing permanent law. The fact of a paragraph break does not on its own imply that the second paragraph was meant to be independent of the first paragraph.

Tin Cup observes that elsewhere in the 1993 Budget Act, Congress did not use a paragraph break when restricting uses of funds appropriated in fiscal year 1993. *See, e.g.*, 106 Stat. at 1323–24. It argues that this suggests that a paragraph break was used intentionally to set apart the second paragraph as an independent provision. However, the structure of these provisions bolster's the Corps's interpretation of the 1987 Manual provision. In each of the examples that Tin Cup cites, the second provision was clearly mandatory: it used the word "shall" to set a limitation on how an appropriation in the first provision was to be used. *See* 106 Stat. at 1323–24. In the paragraphs at issue in this case, the fact that Congress did not string together the two provisions and did not use the words "Provided" or "Provided further" further suggests that the second paragraph was not mandatory and was instead a description of the consequences of the mandate in the first paragraph. Tin Cup has not shown a clear statement from Congress that the second paragraph in the 1993 Budget Act enacted a mandatory, permanent change in substantive law.

III

Given that we require a clear statement of futurity in order to give permanent effect to a provision of an appropriations act, we need not delve into legislative history to explain the 1993 Budget Act's provisions. *See Bldg. & Constr. Trades*

*Dep't, AFL-CIO*, 961 F.2d at 274 (observing that "legislative history can only help to explain a statute; it cannot reconstruct it"). Given the strong presumption against appropriations acts enacting permanent changes in substantive law, the absence of a clear statement of futurity in the 1993 Budget Act is dispositive. The 1993 Budget Act prohibited the Corps from using the 1987 Manual during fiscal year 1993, and Congress included a second paragraph to explain what it expected the Corps to do instead.

**AFFIRMED.**

BEA, Circuit Judge, concurring in judgment:

I agree with the majority's ultimate conclusion that the district court did not err in granting summary judgment to the Army Corps of Engineers (the "Corps"). However, because I think that the 1993 Budget Act contained sufficient words of futurity to bind the Corps after the 1993 fiscal year, I write separately.

I

A

As discussed by the majority, the Corps makes determinations regarding what is a "wetland" within the meaning of the Clean Water Act ("CWA") and its implementing regulations. The first such manual was published in 1987 (the "1987 Manual"). The 1987 Manual identified three key elements that define the presence of wetlands: (1) the presence of vegetation adapted to saturated

soil ("vegetation"); (2) the presence soil that is permanently or seasonally saturated by water ("hydric soil"); and (3) appropriate hydrologic conditions, such as the saturation of soil during the growing season ("hydrology"). Importantly for this case, an appendix to the 1987 Manual instructs that the "growing season" can be identified as the days that the soil at a depth of 19.7 inches reaches a temperature above 5 degrees Celsius.

In 1989, the Corps released a new version of the wetlands manual (the "1989 Manual"). However, in appropriations acts passed in both 1992 and 1993, Congress sought to prevent the Corps from using the 1989 Manual to make wetlands determinations.

In the 1992 Act, Pub. L. No. 102-104, 105 Stat. 510 (1991) (the "1992 Budget Act"), Congress prohibited the use of funds appropriated by the bill to delineate wetlands under the 1989 Manual or any subsequent manual "not adopted in accordance with the requirements for notice and public comment." Title I, 105 Stat. at 518. The 1992 Budget Act also required the Corps to use the 1987 Manual to delineate any wetlands in any ongoing enforcement actions or permit application reviews. *Id*. These provisions effectively required the Corps to abandon the 1989 Manual and revert to the 1987 Manual during the 1992–1993 fiscal year.

Because the 1992 Budget Act was an appropriation bill, it was necessary to revisit the issue of the wetlands Manual during the 1993 appropriations process. The 1993 Budget Act again prohibited the Corps from using any funds to implement the 1989 Manual or any subsequent manual "adopted without notice and public comment." Title I, 106 Stat. at 1324. However, the 1993 Budget Act included an

additional provision which stated that "the Corps of Engineers will continue to use the Corps of Engineers 1987 Manual, as it has since August 17, 1991, until a final wetlands delineation manual is adopted." Title I, 106 Stat. at 1324.

The 1993 Budget Act also appropriated funds for the National Research Council ("NRC") to make recommendations to EPA and Congress regarding future wetlands regulation. H.R. Rep. No. 102-710, at 51. In 1995, the NRC recommended a number of changes to the wetlands delineation process. *See Nat'l Research Council, Comm. on Characterization of Wetlands, Wetlands: Characteristics & Boundaries* (1995) (National Research Council Report). Among those changes, the NRC recommended that the Corps should either abandon its focus on "growing seasons" or that wetland determinations should become more regionally focused.

In response, the EPA has issued a number of "regional supplements" to the 1987 Manual. In 2007, after public notice and comment, the Corps published its regional supplement for Alaska (the "Alaska Supplement"), which provides specific guidance regarding the identification of wetlands in Alaska.

B

Tin Cup, LLC owns a 455-acre parcel of land near North Pole, Alaska. Tin Cup seeks to build a pipe fabrication and storage facility on the parcel. The relocation project will entail the placement of a gravel pad, as well as the construction of several buildings and a railroad spur. Thus, the project will require the excavation and laying down of

gravel material, which is a regulated "pollutant" under the Clean Water Act. *See* 33 U.S.C. § 1362(6).

The Corps examined the extent of wetlands on the site and issued a jurisdictional determination, concluding that wetlands were present on 351 acres of Tin Cup's 455-acre site. The Corps' wetlands determination included about 200 acres of permafrost, which it found qualified as a wetland using the Alaska Supplement. The Corps issued Tin Cup a permit for the project, but the permit included special conditions requiring Tin Cup to, among other things, construct a "reclaimed pond and riparian fringe" of between 6 and 24 acres total in size and a 250-foot-wide buffer around the riparian fringe totaling at least 23 acres.

Tin Cup objected to the Corps' jurisdictional determination, arguing that the permafrost was not a "wetland." Tin Cup argued that because the permafrost's ground temperature at a depth of 19.7 inches never rises above 5 degrees Celsius, the permafrost areas have no "growing season" within the meaning of the 1987 Manual and thus were not wetlands. After a series of regulatory proceedings and appeals, including two administrative appeals under the APA, the Corps' jurisdictional determination and conditions remained unchanged.

Dissatisfied with that result, Tin Cup filed the instant lawsuit in the District of Alaska, seeking review of the Corps' permit pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. The parties filed cross-motions for summary judgment. The district court granted The Corps' motion for summary judgment and denied Tin Cup's motion for summary judgment. Tin Cup appealed the district court's summary

judgment order to this court. We review the district court's order granting summary judgment de novo. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005).

II

As the majority correctly states, the first key issue we are called upon to decide is whether the 1993 Budget Act requires the Corps to use the 1987 Manual until it adopts a new manual via notice and comment. We have held that "[a]s a general rule of thumb, appropriations acts are in force during the fiscal year of the appropriation and do not work a permanent change in the substantive law." *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 304 (9th Cir. 1991). "To rebut this presumption takes a clear statement of 'futurity,' such as 'hereafter.'" *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 806 (9th Cir. 2005). Ultimately, "[t]he question is one of legislative intent." *Evans*, 952 F.2d at 304.

The relevant portion of the 1993 Budget Act contains two provisions. In the first paragraph, Congress prohibited the Corps from using any funds appropriated by the 1993 Budget Act to implement the 1989 version of the Corps' wetlands manual or any subsequent manual "adopted without notice and public comment." Title I, 106 Stat. at 1324. Next, the 1993 Budget Act includes a provision that states that "the Corps of Engineers will continue to use the Corps of Engineers 1987 Manual, as it has since August 17, 1991, until a final wetlands delineation manual is adopted." Title I, 106 Stat. at 1324.

In my view, the plain language of the 1993 Budget Act demonstrates Congress's clear intent that the Corps continue using the 1987 Manual beyond the 1993–1994 fiscal year.

The relevant provision contains two indications of futurity. First, the Act provides that the Corps "will continue" to use the 1987 Manual. The word "will" is a word of futurity. *See* Merriam-Webster Dictionary 603 (Home and Office Ed., 1995) (defining "will" to mean "used as an auxiliary verb to express . . . simple futurity").

Second, the Act tells the Corps how long it must continue to use the 1987 Manual: "until" it adopts a new manual. Congress has explicitly recognized the word "until" as a word of futurity in the context of appropriations bills. *See* H.R. Rep. No. 88-1040, at 55 (1963) (the "most common technique" to make funds "available for longer than a one-year period" is to add the words "'to remain available until expended'"). The combination of "will" and "until" in the 1993 Budget Act demonstrate Congress's clear intent for the Act to bind the Corps beyond the 1993–1994 fiscal year.

The majority's primary response on this point is the note that the 1993 Budget Act does not use the word "hereafter." The majority argues that, "hereafter" is the most common word of futurity in appropriations bills, that Congress used "hereafter" elsewhere in the 1993 Budget Act, and that the absence of "hereafter" in this provision demonstrates that Congress did not intend to express futurity.

This argument is unpersuasive. The majority cites the Government Accountability Office's ("GAO") "Red Book" on the interpretation of appropriations bills for the proposition that "hereafter" is the most common word of futurity. *See* Government Accountability Office, *Principles of Federal Appropriations Law* (4th ed. 2016 rev.) at 2-86. But the Red Book itself recognizes that "hereafter" is not the only word of futurity and that, consistent with past

congressional use, "until" can also be used to express futurity in certain contexts. *See id.* at 2-26. We have previously recognized the expertise of the GAO in this area and have relied on the Red Book in interpreting appropriations bills. *See, e.g. Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*, 767 F.3d 912, 923 (9th Cir. 2014). The majority provides no basis to rely on that expertise selectively.

The majority is, of course, correct that Congress used the word "hereafter" in other portions of the 1993 Budget Act when expressing futurity. But the fact that Congress used one word of futurity in some contexts and another word of futurity in another context is hardly remarkable. This is particularly true when both the GAO and Congress itself have recognized that there are other ways, including the use of the word "until," to express futurity clearly.

Next, the majority contends the Corps is not bound by the second paragraph of the 1993 Budget Act because the paragraph is a description of what the Corps will do, not a command. The majority bases this argument on the use of the word "will" instead of the word "shall." The majority argues that by using the word "will," Congress intended to describe what the Corps had already stated it would do if it could not use the 1989 Manual (namely, use the 1987 Manual) and did not intend to *command* the Corps to take that course of action.[1]

_____

[1] The majority cites *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004) for the proposition that "will" is not necessarily binding. But *Norton* is distinguishable. In *Norton*, the Bureau of Land Management ("BLM") was required to create land management plans for certain parcels of federal land. *Id*. at 58–61. One of the land management plans stated that the BLM "will" conduct a monitoring program. *Id*. When the BLM did not conduct a monitoring program, environmental plaintiffs sued,

But the word "will" can be a command and is often indistinguishable from the word "shall." *See* Black's Law Dictionary 1771 (Revised 4th Ed. 1968) (defining "will" as "[a]n auxiliary verb commonly having the mandatory sense of 'shall' or 'must'"). The context of the provisions does not provide a reason to deviate from this plain meaning. In fact, Congress's use of "furthermore" to start the second paragraph, immediately following a paragraph that contained a command, demonstrates that Congress understood the second paragraph to contain a second, additional *command*.

Additionally, if the majority is correct, then the second paragraph is likely superfluous, running afoul of the canon that statutes should be construed so as to give effect to all of their provisions. *See Corley v. United States*, 556 U.S. 303, 129 (2009); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012). If all Congress meant to achieve through the 1993 Budget Act was to bar the Corps from using funds to enforce the 1989 Manual for the coming fiscal year (which is what

---

arguing that the BLM was bound to fulfill its commitments under the land management plan. *Id.* The district court dismissed the claims, but the Tenth Circuit reversed. *Id.* The Supreme Court reversed the Tenth Circuit, holding that the use of the word "will" in the land management plans did not create a binding commitment on the part of the BLM. *Id*. at 67–72.

*Norton* is distinguishable from this case for at least two reasons. First, it did not concern the interpretation of an appropriations bill, but rather the interpretation of words in a BLM land management plan. Second, *Norton* involved a unilateral commitment by the BLM. *Norton* did not consider whether "will" was a "command," because there was no one to command. The question was whether "will" created a binding commitment, not whether it was being used to command a specific course of action by another party.

the majority and the Corps contend), it could have stopped writing after the first paragraph.  Congress had no need to describe in a nonbinding fashion what the Corps would do as a result of its command.

In short, "will" and "until" are words of futurity that express Congress's intent for the 1993 Budget Act to bind the Corps beyond the 1993–1994 fiscal year.  Thus, the much stronger reading of the 1993 Budget Act is that Congress was commanding the Corps to continue its use of the 1987 Manual until it adopted a new wetlands manual.  As a result, I would hold that the Corps was required to apply the 1987 Manual to Tin Cup's case.

## III

Nonetheless, I would still hold that the district court did not err in granting the Corps' summary judgment on Tin Cup's claims.  Although the 1993 Budget Act continues to bind the Corps, the 1993 Budget Act does not preclude the Corps from applying the Alaska Supplement because language from the 1987 Manual itself allows the Corps to amend and supplement the 1987 Manual and the Alaska Supplement is consistent with that language.

The 1987 Manual identifies three factors that should be evaluated in making wetlands determinations: vegetation, hydric soil, and hydrology (the "Three Factors").  The 1987 Manual requires that, for the hydrology element to be satisfied, the regulator must "establish that a wetland area is periodically inundated or has saturated soils during the growing season."

An appendix to the original 1987 Manual defined "growing season" in terms of the days on which soil temperatures were higher than 5 degrees Celsius at a depth of 19.7 inches. But the 1987 Manual acknowledged that hydrology was "often the least exact" of the Three Factors and allowed regulators to approximate the growing season based on "frost free days" or establish hydrology through direct observation of conditions on the ground, such as inundation or soil saturation, sediment deposits, drainage patterns, or certain characteristics of vegetation.

In light of these inexact standards, the Corps argues that the language of the 1987 Manual clearly contemplates regional supplements like the Alaska Supplement, which can alter some of the finer points of wetlands identification based on regional factors. Indeed, the 1987 Manual provides that the methods for analyzing the Three Factors can be altered, as "site-specific conditions may require modification of field procedures."[2]

The 1987 Manual explicitly acknowledges that "certain wetland types, under the extremes of normal circumstances, may not always meet all the wetland criteria defined in the manual." The 1987 Manual goes on to state that "such wetland areas may warrant additional research to refine methods for their delineation."

---

[2] Tin Cup argues that these statements relate to certain known "problem areas" and that permafrost was not one such "problem area." However, Tin Cup's argument is undercut by subsequent Corps guidance, which specifically stated that the list of "problem areas" was non-exclusive and the 1987 Manual's statements regarding flexibility were meant to be broader than the list of "problem areas."

Relying on this language, the Corps has made alterations to the method for identifying hydrology and the "growing season" for nearly three decades, including before the 1993 Budget Act was passed. In 1992, before the 1993 Budget Act was passed, the Corps issued guidance stating that, although the soil temperature factor noted in the appendix of the 1987 Manual was the "primary" definition of growing season, "local means of determining growing season may be more appropriate and can be used." *See* U.S. Army Corps of Engineers, "Clarification and Interpretation of the 1987 Manual" (Mar. 6, 1992).

The Alaska Supplement—including its definition of the "growing season," which is at issue here—is nothing more than formal guidance regarding the "local means" that were permitted under the 1987 Manual and its subsequent guidance documents. Given that the Corps was already allowed to use such "local means" at the time Congress passed the 1993 Budget Act, the 1993 Budget Act cannot be read to prohibit use of the Alaska Supplement.

Tin Cup does not meaningfully dispute that the Corps has at least some ability to supplement or amend the 1987 Manual. Instead, Tin Cup's only argument is that the Alaska Supplement is not a "true" supplement because it disregards the soil temperature factor in determining the growing season. In Tin Cup's view, because the Alaska Supplement does not consider ground temperature in determining the growing season, it contradicts the 1987 Manual and cannot be a "supplement" to that Manual.

This argument is not persuasive for at least two reasons. First, soil temperature was not even the exclusive method of determining growing season and hydrology under the original

1987 Manual. As discussed above, the Manual allowed regulators to "approximate" the growing season based on frost free days or establish hydrology without reference to a "growing season" through direct observation of conditions on the ground, such as inundation or soil saturation, sediment deposits, drainage patterns, or certain characteristics of vegetation. As a result, declining to use soil temperature as part of the hydrology analysis would have been permissible under the original 1987 Manual, given certain circumstances.

Additionally, the 1987 Manual as it existed and was used at the time of the 1993 Budget Act clearly permitted regulators to disregard soil temperature in favor of "local means" of determining a growing season. *See* U.S. Army Corps of Engineers, "Clarification and Interpretation of the 1987 Manual" (Mar. 6, 1992). The Alaska Supplement represents the Corps' attempt to define just such "local means" for making wetlands determinations in Alaska. Thus, there is no basis to conclude that soil temperature must always be considered when making a wetlands determination and that any method that does not consider soil temperature contradicts the 1987 Manual.[3]

---

[3] Tin Cup argues that there must be some limits on the Corps' ability to amend the 1987 Manual or else the 1993 Budget Act would be rendered meaningless. This may be true, but the 1987 Manual itself provides those outer bounds. For instance, the Manual states that, although wetlands determinations are flexible and subject to local considerations, "the basic approach" of using the Three Factors of vegetation, hydric soils, and hydrology "should not be altered."

Thus, if the Corps attempted to adopt a regional supplement that applied only two of the Three Factors, Tin Cup's argument would have more force. Similarly, if the Corps attempted to adopt a regional supplement that replaced the Three Factors with other factors, that action might exceed the Corps' authority. But in this case, the Corps' Alaska

Consequently, although Tin Cup is correct that the Corps is required to use the 1987 Manual, I would hold that the Alaska Supplement is a proper supplement that is authorized by the 1987 Manual itself.  As a result, I would conclude that the district court did not err when it rejected Tin Cup's argument that the Corps should be barred from using the Alaska Supplement.

Supplement retains the Three Factor evaluation.  The Alaska Supplement merely provides different, region-specific methods for identifying the Three Factors in Alaska's unique environment.